Good morning and thank you, and may it please the Court. My name is Tom Sebaugh. I represent the parents, wife, and children of Joseph Perez, and I would like to reserve five out of my fifteen minutes for a rebuttal, please. Watch your time, and we will do our best to see if we can give you a cue. Thank you. Joseph Perez died in one of the worst ways imaginable. When he cried out, I can't breathe, he was restrained hand and foot and being compressed down under a backboard surrounded by police officers, sheriff's deputies, and paramedics. Seconds after he said, I can't breathe, as shown by the video, a police officer sat on the backboard. The county of Fresno's own medical examiner determined Joseph Perez was killed by asphyxiation, classifying his death as a homicide. Notwithstanding these facts, the district court in this case granted qualified immunity to everyone involved in his death, and that decision we submit was wrong. First, the district court's decision is contrary to this court's decision in Drummond, which has been the law of this circuit for twenty years. Drummond directly prohibits using body weight to restrain a prone and handcuffed person who poses no serious safety threat, even if that person is agitated. Drummond held that conduct would be unconstitutional and rejected qualified immunity. And we think Drummond stands for a proposition that applies to these facts. Perez, in this case, is outnumbered ten to one at the time that he's placed under the backboard. He is handcuffed from the beginning of the encounter. His legs are tied together. He's prone chest down on the ground. Before the backboard is placed over him, the bindings on his legs had been attached to the bindings on his hands for thirty seconds to a minute. At that point, he was not going anywhere, and he was not a threat to anyone. Using under those circumstances what amounts to potentially lethal force against him was clearly unjustified and unnecessary. Do you claim the unconstitutionality of the earlier handcuffing and leg restraints and so on, because all of those were removed or at least loosened in a different position before the backboard incident? Should we be focusing on the backboard incident, or are you trying to attach liability earlier? I think the significance of the earlier restraint. Let me answer the question. The backboard is what was decisive. The four minutes under the backboard, the medical examiner believed, was what killed him, what caused him to asphyxiate. The significance of the 16 minutes of prone restraint that led up to that is that it primed him physically to be asphyxiated in that position. And we also noted that the prolonged prone restraint that preceded the time under the backboard was outside the policy. Okay, but you don't say it was clearly established that the officers were violating his rights earlier on? Well, I think what's important and what's decisive is what happened after he was positioned under the backboard. At the time that the backboard was positioned overtop him, he says, I can't breathe. And that can be heard on the video, and the district court indicated, and we agree, that it's safe to assume that that was heard by all of the officers, deputies, and paramedics who were present.  After the court, he was positioned under a backboard. An officer sat on it, and according to the medical examiner, that caused him to asphyxiate and die. The district court attempted to distinguish Drummond on two grounds. First, that Perez was allegedly resisting during the encounter, and second, because of the presence of the paramedic. As to the resistance, in our view, the extent to which he would have been able to resist under the circumstances I've just described is at a minimum disputed. In Drummond, the word that this court used to describe Drummond's conduct was agitated, and we think that's a fair description of Perez during the fatal four minutes. He was agitated, perhaps not lucid, but he was not punching any officers, was not kicking, was not verbally threatening, was not doing anything that, at that point, could have presented any meaningful threat to anyone. My recollection from the record is that he was flailing, so his body was sort of moving all around. Whether he was trying to be aggressive with the officers or not, he was not what you might call calm. Well, I think once he's positioned under the backboard, a dynamic develops where, on our facts, to the extent he is trying to lift his chest up, he is trying to lift his chest up because he can't breathe. But wasn't he sort of doing those, his body was moving and active before that point? Well, his body is moving and active, according to the officers, throughout the prone restraint, but we contend that the prone restraint itself was what was prompting this dynamic to develop. And this is what the Supreme Court itself indicated in Lombardo, which is a passage to which we've attached great emphasis, is that when someone, that the police are trained, that when someone's restrained prone with weight on their back, their struggles may be because they are trying to breathe and not necessarily because they're trying to disobey the officers. That's how all of the officers were trained. In our view, all of that could have been avoided if they had simply restrained him on his side, as they were trained to do, instead of chest down. Well, I guess what's your take on the evidence, as I heard it, that there was some discussion about having the board under him, which plausibly seems much better, and the paramedics directed otherwise? I mean, that seems at least different from Drummond, where the officers just decided to sit on his neck. The question is, what do we do here? And the paramedics, I don't know if you dispute that, but it seems, and I watched and listened to the tape, they said, you know, we're going to do it this way. We're not going to do what other people thought about, right? There was some discussion, wasn't there? And this is the second point that the district court made in distinguishing Drummond, the instructions from the paramedic, which are undisputed, that the paramedic stated, sit on that board. That can be heard on the video. I do want to add an asterisk that, of course, the paramedic denied saying that at his deposition or could not claim not to recall saying that. But that is the evidence. I would submit that if, hypothetically, all of the individuals involved in the restraint were law enforcement officers, that it would be uncontroversial, hopefully, that this would be unconstitutional. What does adding the presence of a paramedic to the mix change? And I submit it should not change the outcome. If it would have been beyond debate, to use the language of qualified immunity, to an officer or deputy that restraining someone this way is unconstitutional, then it's no defense to say, well, the paramedic told me to do it. Well, so, I mean, I've been struggling with that in preparing for this case because it seems to me that that is a material difference in the sense that if you have a medical professional on site who is giving direction in the context or within the scope of, arguably, within the scope of sort of medical judgment, doesn't that change the calculus? Because that's different than just, as you say, if everybody here was law enforcement, none of them have particular medical training and they're just making law enforcement choices. Why isn't that a material difference? Well, I agree that there's an important distinction between paramedics acting in a law enforcement capacity and paramedics providing medical care. I would submit it's by no means clear that what is going on here can be characterized as medical care. My understanding from the record was that the paramedics directed the backboard for therapeutic reasons. We need this to be administered to facilitate his transport for treatment as opposed to just we need to bind him, constrain him in some way. Well, as the paramedic expert, the only paramedic expert to testify indicated, that's simply not what a backboard is ever used for, that a backboard is not a restraint device. It was being used for a non-medical purpose, in our view, to assist with the police officers in subduing him in a struggle that had already been going on for 16 years. Well, had they done it right, wouldn't it have been a better means of transport than just throwing him in the back of a police car, which the way things turned out, that would have been the best thing to do. But from a point of view of him hurting himself, wouldn't the backboard have been a plausible idea? Well, our paramedic expert indicated no because... That makes it, that's, your expert differing from what the paramedic did sounds more like negligence or malpractice, doesn't it? Well, what's disputed here is whether the restraint under the backboard that caused him to asphyxiate was medical or law enforcement in character. I would note that in the McKenna case from the Sixth Circuit, which a number of parties have decided, that decision was ultimately left up to a jury, which was instructed that the provision of medical care in an emergency does not violate the Fourth Amendment. The jury was given that instruction, returned findings against the officers, and those were affirmed. You're running into your five minutes, but if I could ask you quickly, obviously you'd like to get as many defendants as you can, but can you say anything about, you know, to me as a person just reading it, Calvert and Anderson seem like the most culpable. Do you make any distinction or are you still trying to bring in all ten of the people who are outnumbering him? I agree that they are culpable, but all of the officers, deputies and paramedics, heard the statement, I can't breathe. All of them had an affirmative obligation under their training. And I do want to emphasize this as well. The training is that if you observe excessive force by someone in your department or another department or a paramedic, you have an obligation affirmatively to intervene. And what is tragic and frustrating about this case is that nobody intervened, and the result was the unnecessary, avoidable, preventable death of Joseph Perez. All right. So we turn to the defense side here. Is Mr. Weakley going first? Good morning. My name is James Weakley. I'm representing the County of Fresno and the Fresno Sheriff's Deputies Menezian, McEwen, Stoltenberg, and Robnett. And I was actually prepared to talk about the use of the towel and the hobble restraint, but it sounds like those aren't issues that the plaintiffs claiming are in and of themselves, uses of force that are unconstitutional, if I'm interpreting that correctly. But I would just briefly address the use of the towel was not a use of force. It was used merely to prevent Mr. Perez from banging his face into the sidewalk, which is undisputed. He was bleeding. He was banging his face in so much that he caused himself to bleed. Deputy McEwen tried to hold him by the hair. That didn't work, so he got a towel and prevented him from hurting himself. That was the sole use of the towel. It wasn't a spit mask. The hobble restraint was never a hog tie, even under the plaintiff's expert's definition, which is not supported by any authority. There was never a hog tie in this case, and the Ninth Circuit allows the use of hobble restraints if used appropriately. So there's really no dispute that the hobble was never put into a hog tie situation. So going now to the qualified immunity, obviously it's the plaintiff's burden to produce a case that shows the law was clearly established, that what the officers did at the scene was unconstitutional. The only case he really points to is Drummond, which is clearly distinguishable. The Court and counsels already talked about a couple of distinguishing factors, which are in and of themselves enough to distinguish Drummond, but there's another important distinction, and that's the conduct of the officers in Drummond versus the conduct of the officers and deputies in our case. In Drummond, the witnesses said that Drummond himself was cooperative, not combative, not moving the entire time, as opposed to here where, as the courts pointed out, Mr. Perez was resistant. He wasn't a threat to the officers, but he was certainly resistant, and that was the whole purpose of trying to get him secured so they could take him to the hospital to get treatment. I mean, clearly the two cases, this case and Drummond, have some factual distinctions, and I think some of them are arguably material, but it has to be true, as plaintiff's counsel has argued, right, that just because you have a paramedic on site doesn't change the entire calculus, doesn't mean that the officers can just sort of put blinders on and do whatever the paramedic says, even if it's just obvious in front of them there's a problem. Don't they have to intervene, and why doesn't that apply here? Well, there's no case that's on point, but just from my personal standpoint, I would assume that if the paramedic told the officers to shoot him or to kick him or to hit him, you know, anything that's an obvious use of force, obviously then the officers would not follow those instructions, and they would intervene and stop the paramedic from doing that if the paramedic was trying to do something abusive. But the fact is, in this case, the law enforcement officers, they're not familiar with how to properly secure somebody to take them to the hospital. And if a paramedic is saying we need to get him secured to the backboard, all the officers and deputies are doing is following that advice. And they may say, well, this doesn't seem usual. I haven't seen this done before, but they're the experts. And so that's the distinction. Why isn't that an argument for the jury? I'm sorry? Why isn't that an argument for the jury? I mean, that's a perfectly good argument, but I'm not sure how it falls into qualified immunity analysis. Because there's no clearly established law on this point, and that's the purpose of qualified immunity. Well, if the law is clearly established, they shouldn't be engaging in this procedure. And their defense is, well, we were told to. I'm not sure why that isn't a question for a jury as opposed to falling into the qualified immunity analysis. I think the purpose of qualified immunity is to protect law enforcement from having to have the case tried by a jury. And there's another important distinction, though, here, and that is after Mr. Perez said he couldn't breathe, and listening to the body cam video and audio, it's clear if you listen enough. And sometimes it's hard to hear. But the officers and deputies told him to relax 38 times in 16 minutes as opposed to the officers in Drummond that were laughing while they were putting weight on his neck after he said he couldn't breathe and they were choking him. The interesting thing about Drummond is, and it's not necessarily clear from the opinion, but the city's argument in Drummond was exactly the same argument here. In fact, the briefs say he was resisting all the time, he was screaming profanities, he was thrashing around. I don't see much of a difference factually if you accept the city's argument in Drummond. And I recognize that's not detailed in the opinion. Well, I'm not familiar with the city's argument in Drummond, but I would tell you that at least twice after he said he couldn't breathe, officers or deputies again told him to relax. Actually, let me read from the city's brief in Drummond. Drummond continued to spew profanities at the officers from the Crown until just seconds before they determined he was not responding. So, and it goes on to say he was struggling all the time, putting up a tremendous fight. And I recognize it's not in the Drummond opinion spelled out that way, but that's the same argument you're making. Well, in our case, the qualified immunity should apply because we don't have a case that would clearly point out to any and all reasonable officers that this conduct of following the directions of medical experts is unconstitutional. Counsel, I want to point out you're eating into your co-counsel's time here. So I don't know. If you're each taking five minutes, you've already taken more than that. Thank you. All right. Good morning, Your Honor. Steven Renick for the City Defendants. I'll try and be brief. I don't want to eat into co-counsel's time. But just to follow up on what Your Honor said, there is a fundamental difference because of the involvement of the EMS personnel. This was not a situation, as counsel was talking about, strictly of officers using force to restrain. And in that case, maybe you have a legitimate question for the jury. Did the restraint, the struggling, all of that justify what was the force that was used? But that's not what was going on here. And the district judge, in his order, talked about there was nothing to suggest that Anderson was attempting to do anything other than effectuate medical transport and care per 5150 to get medical help at the hospital for Mr. Perez. And that's the fundamental difference here. The backboard, as the district judge described it, was being used as a medical implement. It was not a type of force implement. It wasn't a baton. It wasn't a taser. It wasn't being used for that purpose. The only reason it was being used was because these medical professionals felt they needed Mr. Perez to be more firmly restrained in order for them to do their jobs. That's why they instructed the various law enforcement officers to assist them in that. That's why the question was raised about Calvert and Anderson. Officer Calvert was specifically instructed to sit on the backboard. He was told where to sit on the backboard. This wasn't a situation like George Flory, or Drummond, or wherever, where you had officers acting on their own to use force that they may have thought was appropriate, but for the purpose of law enforcement, to restrain an individual that they were engaging in a law enforcement interaction with. What happened after the EMS officials arrived and put the backboard on was medical. What about the period after he said he couldn't breathe? Again, at that point there were three EMS personnel there controlling the situation. They were the ones monitoring. They were the ones making decisions. The question becomes, and this is where it is truly qualified immunity because there's no case at all, when does an officer say no? When is an officer supposed to put his or her non-medical expertise over that of a medical professional on the scene? If you'll indulge me, there was an incident about six weeks ago in Texas where a congressman who used to be the physician at the White House was at an incident a teenager started seizing at a rodeo. A relative of the teenager was a nurse. She was there. The congressman came over. He wanted to help. And then all of a sudden law enforcement came over and forcibly made those people leave, throwing the congressman to the ground, literally putting him in handcuffs. If that young woman had died, wouldn't we be turning this entire argument around? How dare police officers interfere with medical professionals? And that's what's at issue here. Maybe this was medical malpractice. Maybe it was a poor choice on the part of the EMS people. But it wasn't a violation of constitutional rights. The real damage, in one sense, was done when they decided to put the backboard on him rather than under him. Exactly. But that was. . . If you look at the video, I was sort of throwing out that Calvert was the worst. But everybody else is pressing on him, too, and you might easily think that he would have died anyway. And perhaps. . . But that, of course, is not the issue here, as counsel graciously admits. You could say. . . When you say, when do the officers say no, the alternative hypothesis is the officers say, no, we're not going to put the board on top of him. You've got to put the board under him. And if that's not what the medical professionals felt was the appropriate medical determination, are we going to say they have to do that? Maybe that's the law that this court wants to make, but it certainly wasn't the law in 2017, and they shouldn't be held for doing what they were told they should do. I've eaten into a little of my colleagues' time. Unless the court has questions. Thank you. Good morning, Your Honors. May it please the Court. Justin Sarno appearing on behalf of American Ambulance and Morgan Anderson. The district court properly granted qualified immunity in this case, and that ruling should be affirmed for several important reasons. The first, Paramedic Anderson's purpose in arriving on scene on the date of the incident was to render solicited medical care. He wasn't there to effectuate a custodial seizure. He wasn't there to effectuate an arrest. He wasn't equipped with an X26 taser, a firearm, baton, pepper spray. Rather, he was there with medical implements designed to facilitate medical care and transport for Mr. Perez. In a sense, he was using the law enforcement people. That is, you couldn't even have a 1983 case if the EMS just came upon the scene and did all this himself. That's right, Your Honor. He doesn't have a taser, but he has ten officers or seven officers to help him. But he has medical implements, and he's there to try and transport the suspect. In fact, Officer Rossetti called the EMS on two occasions, escalated the dispatch call from Code 2 to Code 3. This was a grave situation of medical distress. When Paramedic Anderson arrived on scene, the suspect was thrashing and flailing and beating his head into the concrete, so much so it was making it functionally impossible for Paramedic Anderson to render even the most rudimentary of physical examinations. He couldn't even take his pulse. In fact, Paramedic Anderson instructed the officers to remove a towel from Mr. Perez's head and to instead cradle his cranium with their hands because, as Judge Ishii noted in his summary judgment order, Mr. Anderson's purpose and intent and goal was to care for this suspect. Now, tragically, unfortunately, Mr. Perez lost his life that day. But it's for these reasons that the district court correctly held that the law was not clearly established in May 2017 that a paramedic acting under these circumstances was in any way behaving unconstitutionally. And with good reason, because in 2007, the Sixth Circuit in Pete v. Metropolitan Government of Nashville held that a paramedic was entitled to qualified immunity under what Judge Ishii described were strikingly similar facts to the ones that were presented here. Although the decision, the facts were similar, but the question there wasn't. It was whether the EMS seized him so as to violate the Fourth Amendment on seizure. That's correct, Judge Boggs. And what the court held, and I quote from page 221 of the decision, where the purpose is to render medical aid and not to deter, to punish, to incarcerate. Liability under the federal constitution is simply inappropriate, and thus qualified immunity should apply. And what Judge Ishii correctly noted, as you'll see at page 58 of the record, is that in May 2017, there were simply no cases that were contrary to Pete under the circumstances. Cases that Appellant has cited are in opposite. He cites, for example, Tahas v. The City of El Dorado, a 2012 decision from the Eastern District of California. That case, the suspect wasn't under any medical distress whatsoever. Lucid, preschool teacher. Said, I was fine, leave me alone. I don't want to go anywhere, I'm cool. But in that case, paramedics were held liable because the suspect was under no medical distress. This is vastly distinguishable. There was no case in the Ninth Circuit, and in fact, not only was it not clearly established, it was clearly established that paramedic Anderson's conduct in this case was constitutional. I would respectfully submit that both as a matter of law and policy, state medical malpractice is the remedy and the avenue of redress, not the federal constitution. I see that my time has expired, Your Honors, unless the court has any questions for me. I would thank you for your time and respectfully submit. Thank you, Counsel. Thank you. Thank you, Your Honors. Tom Seabog. Judge Thomas, I agree that the resistance in Drummond and the resistance in this case are not materially distinguishable. That leaves the question of whether the presence of the paramedic fundamentally changes the analysis. The question was posed, when does an officer say no? I think the answer is that the officer says no when it's been clearly established for 20 years that applying weight to a prone and helpless detainee who's already been restrained and subdued violates the constitution. Any officer who's familiar, that question was beyond debate. Any reasonably well-trained officer in California would have known that the instruction to sit on the backboard would have been potentially lethal. I don't remember from any of the briefing a prior case before this situation of medical staff being on site and giving direction to law enforcement. That's correct. So there's none? That is not something that's been decided to my knowledge. But I think not just the findings of Drummond, the conclusions of Drummond, but the method of Drummond are instructive. Because as of Drummond, there had been no case specifically saying that restrained asphyxia on these facts would be unconstitutional. But, of course, in Drummond, this court concluded that it obviously was and denied qualified immunity. So you would want us to rely on the obviousness rule? Yes, as in one alternative is to rely on the obviousness rule. This is an inquiry where I don't think we have to check our common sense at the door. Anybody who's not a paramedic or police officer would know, I submit, that sitting on a backboard of someone who's restrained prone could interfere with that person's ability to breathe. What tells us that that's an obviousness thing? Sorry? What tells us that that's an obvious principle? I guess I'm just not sure. There's been horrible examples, particularly in recent times, of these situations going wrong and people dying at the hands of law enforcement, no doubt. And we are aware of that in a way that maybe we weren't just a few years ago. And not to be callous to that, but this is a little bit different, isn't it? Where you have a medical person on site and you have this backboard that is being used by medical personnel to facilitate medical treatment. It went horribly wrong. I'm just trying to figure out how do I fit this in the box of any reasonable officer would understand you can't just allow a paramedic to proceed in this way. I would just submit it's been 20 years since Drummond. Drummond has been cited hundreds of times in the circuit for this proposition. At this point, every competent officer, deputy, and paramedic knows not to restrain people prone with weight on their back for a protracted period of time because it causes them to asphyxiate. Everybody knows that. Nobody does it. And inexplicably, in this case, they did it, and this was the result. This was an entirely foreseeable result of not doing what you're supposed to do in this situation. I would submit also with respect to the subjective intent of the officer or the paramedic in providing medical care, subjective intent, of course, under a seizure analysis is irrelevant. It's an objective inquiry. And also the paramedic's credibility is nil in light of his deposition testimony, and a jury could decide not to believe any of it in this case. I think with respect to Pete, I think Pete should be read in light of McKenna, which I've already mentioned, and also Judd. Judd, I think, would be the most helpful reference point we would submit for the plaintiffs from that line of cases in the Sixth Circuit. In that case, a paramedic had participated with a police officer in a restraint, and the Sixth Circuit in that case gave short shrift to the idea that the paramedic should be held to a different standard, simply saying if the paramedic is engaged in a law enforcement function, the paramedic is held to the same standard as the officer, simple. And we think that should be the rule. Thank you, Counsel. The matter of – I don't think there are further questions. So the matter of Perez v. City of Fresno et al. will be submitted. I thank Counsel for your helpful arguments in this case.
judges: Boggs, THOMAS, FORREST